[Cite as *State v. Vaughn*, 2025-Ohio-2274.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

PREBLE COUNTY

|  |  |  |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2024-09-014 |
| | : | OPINION AND |
| - vs - | | JUDGMENT ENTRY |
| | : | 6/30/2025 |
| MARY DEANN VAUGHN, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM PREBLE COUNTY COURT OF COMMON PLEAS
Case No. 24CR014272

Eric E. Marit, Preble County Prosecuting Attorney, and Kathryn M. West, Assistant Prosecuting Attorney, for appellee.

Vanzant Law Office, and James B. Vanzant, for appellant.

## O P I N I O N

**HENDRICKSON, P.J.**

{¶ 1} Appellant, Mary Deann Vaughn, appeals the decision of the Preble County Court of Common Pleas denying her motion to suppress evidence. For the reasons discussed below, we affirm.

## I. Factual and Procedural Background

{¶ 2}   On December 4, 2023, appellant crashed her vehicle into a utility pole on State Route 503 South in West Alexandria, Preble County. Local residents Alyssa Corneilson and her husband heard the crash, immediately lost power to their home, and called 9-1-1. The Corneilsons then went outside to investigate and found appellant walking around her crashed vehicle and complaining of neck and back pain. A front seat passenger was pinned in the car by a fence post. Deputies from the Preble County Sheriff's office and emergency medical services were dispatched. Shortly after their arrival, appellant was transported by ambulance to Miami Valley Hospital.

{¶ 3}   Detective Forrer of the Preble County Sheriff's Department was dispatched to the hospital to investigate. Upon his arrival, appellant was in a hospital room lying in bed. Appellant was not restrained in any way, and the door to the room was open. Detective Forrer did not Mirandize appellant before speaking with her. During the interview appellant stated she was trying to avoid hitting a squirrel when she lost control of her vehicle and hit the pole. Detective Forrer asked appellant if she would provide a urine sample and she consented. Appellant also told Detective Forrer that her urine might show the presence of marijuana and Adderall. The interview lasted just over three minutes.

{¶ 4}   A male nurse was present and assisted with obtaining the urine specimen. The nurse utilized a one-time use disposable cardboard bedpan to collect the urine from appellant. Although Detective Forrer did not independently inspect the bedpan, he could see that it was made of cardboard and appeared to be unused before being placed under appellant. Wearing gloves, Detective Forrer then poured the urine specimen from the cardboard bedpan into a plastic vial (with preservative) from an OVI test kit provided by Ohio State Patrol. After the sample was transferred, Detective Forrer disposed of the

cardboard bedpan.

**{¶ 5}** Appellant's urine specimen was transported to the Miami Valley Regional Crime Laboratory for testing, which revealed the presence of amphetamines, methamphetamines, and benzodiazepines.

**{¶ 6}** On March 4, 2024 Appellant was indicted on three counts of aggravated vehicular assault, three counts of OVI, and driving under suspension. Appellant pled not guilty.

**{¶ 7}** On May 9, 2024, appellant filed a motion to suppress contending that (1) the urine test was neither performed within three hours nor consented to within two hours of the alleged traffic violation; (2) an alcohol substance may have been used as an antiseptic; (3) the urine was not kept in a tamper proof container, and it did not contain the name of the suspect, the date and time of collection or the initials of the person collecting the sample; (4) the urine was not refrigerated while stored nor was it kept for one year from the date of the incident; and (5) the urine sample was not collected by qualified personnel. The motion did not reference any specific facts of urine collection and did not raise any issues with the use of the cardboard bedpan or contamination thereof. Appellant also sought to suppress the statements she made to Detective Forrer at Miami Valley Hospital as the product of a custodial interrogation without proper *Miranda* warnings.

**{¶ 8}** The trial court conducted a hearing on the motion to suppress on June 4, 2024 and Detective Forrer testified regarding the interview and collection of the urine sample. On June 20, 2024, appellant filed a supplemental post-hearing brief asserting that the State had failed to substantially comply with the requirements for urine sample collection because it was unclear if the cardboard bedpan was sealed or sterile prior to its use and therefore the urine testing was unreliable. The next day, by judgment entry of

June 21, 2024, the trial court overruled the motion to suppress. Thereafter, appellant entered no contest pleas to second-degree felony aggravated vehicular assault and one count of OVI. The trial court sentenced appellant to an indefinite prison term of three to four and one-half years for the aggravated vehicular assault offense and a concurrent 180-day term for the OVI offense.

{¶ 9} Appellant timely filed a notice of appeal on September 23, 2024. On appeal, appellant raises two assignments of error for our review.

**II. Legal Analysis**

{¶ 10} Assignment of Error No. 1:

THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING THE MOTION TO SUPPRESS AS THE SAME RELATES TO THE ADMISSIBILITY OF THE RESULTS OF TESTING OF A URINE SAMPLE FOR THE PRESENCE OF DRUGS OF ABUSE AND/OR ALCOHOL.

{¶ 11} In her first assignment of error, appellant argues that the State failed to demonstrate substantial compliance with the regulation governing the collection of urine samples as provided in Adm.Code 3701-53-06(D). Specifically, appellant asserts that because the nurse who assisted in the urine sample collection was not specifically identified at the suppression hearing, the sample collection was not properly witnessed and could not be properly authenticated. Appellant also argues that the use of a cardboard bedpan introduced an unnecessary step in the collection of the urine sample which potentially exposed the sample to contamination, because Detective Forrer did not independently inspect the bedpan before its use.

{¶ 12} "Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact." *State v. Turner*, 2020-Ohio-6773, ¶ 14, citing *State v. Burnside*, 2003-Ohio-5372, ¶ 8. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence to resolve factual questions and

evaluate witness credibility. *State v. Vaughn*, 2015-Ohio-828, ¶ 8 (12th Dist.). "Therefore, when reviewing the denial of a motion to suppress, this court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence." *State v. Leder*, 2019-Ohio-2866, ¶ 17 (12th Dist.), citing *State v. Durham*, 2013-Ohio-4764, ¶ 14 (12th Dist.). "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Cochran*, 2007-Ohio-3353, ¶ 12 (12th Dist.); *State v. Banks-Harvey*, 2018-Ohio-201, ¶ 14 ("the appellate court must decide the legal questions independently, without deference to the trial court's decision").

{¶ 13} In the prosecution of offenses for driving with a prohibited concentration of a controlled substance or its metabolite, the court may admit evidence of the concentration of metabolites in a defendant's urine at the time of the alleged violation as shown by a chemical analysis. R.C. 4511.19(D)(1)(b). However, the sample must be analyzed in accordance with methods approved by the Director of Health. R.C. 4511.19(D)(1)(b); *see also* R.C. 3701.143; *Burnside*, at ¶ 9. Accordingly, the Director of Health has promulgated the regulations for the collection and handling of blood, urine, and oral fluid specimens in Adm.Code 3701-53-06. Subsection (D) provides "The collection of a urine specimen will be witnessed to assure that the sample can be authenticated. Urine is to be deposited into a clean glass or plastic screw top container and capped or collected according to the laboratory protocol as written in the laboratory procedure manual."

{¶ 14} Once a defendant challenges the validity of a chemical analysis test by filing a motion to suppress, the State has the burden of proving substantial compliance with the regulations prescribed by the Ohio Department of Health (ODH). *State v. Mayl*, 2005-

Ohio-4629, ¶ 49; *Burnside* at ¶ 24. "Substantial compliance is limited to excusing only deviations from the regulations that are 'clearly de minimis,' i.e. irregularities amounting to 'minimal procedural deviations.'" *State v. Dugan*, 2013-Ohio-447, ¶ 32 (12th Dist.), quoting *Burnside* at ¶ 24. The extent of the state's burden of proof establishing substantial compliance, however, "only extends to the level with which the defendant takes issue with the legality of the test." *State v. Nicholson*, 2004-Ohio-6666, ¶ 10 (12th Dist.). "Once the State has met its burden, a presumption of admissibility is created, and the burden then shifts to the defendant to rebut that presumption by demonstrating he [or she] was prejudiced by anything less than strict compliance." *State v. Ossege*, 2014-Ohio-3186, ¶ 21 (12th Dist.), citing *Dugan* at ¶ 32.

{¶ 15} Here, the State met its burden of proving substantial compliance with the regulation's witness requirements. Detective Forrer testified that he witnessed appellant provide the urine sample to a male nurse using an unused, single-use cardboard bedpan, and Detective Forrer then immediately poured the urine from the bedpan into the plastic vial from his OVI test kit and sealed it. There was no requirement for a witness other than Detective Forrer. *See Ossege* at ¶ 23-24 (finding the State substantially complied with the urine collection regulation where the same officer both witnessed the defendant produce the sample and sealed the sample). The fact that the nurse was not specifically identified by Detective Forrer is irrelevant, and in fact, the State provided copies of appellant's medical records during discovery which included the names of all medical personnel involved in her treatment.

{¶ 16} The more difficult issue in this case is the use of the cardboard bedpan in collecting appellant's urine. In its answer brief, the State argues that it substantially complied with the regulation, drawing a distinction between the use of the two verbs 'collect' and 'deposit' in the text of the administrative code. The State asserts the

regulation does not require the urine specimen to be *collected* directly into the "clean glass or plastic screw top container." Rather, the State asserts that the specimen could be collected by some other means—provided there is a witness—only to be later *deposited* into those specified containers. We disagree with the State's interpretation and find that the use of 'deposit' in the regulation does not imply a transfer of fluid between containers later in time.

**{¶ 17}** By way of comparison, Adm.Code 3701-53-06(B) states "When collecting a blood sample," a non-alcoholic antiseptic will be used, but then subsection (C) dictates how blood is to be subsequently 'drawn' via sterile dry needle into a vacuum container. Subsection (E) simply states that "collection of an oral fluid specimen is to be done according to the sample collection device instructions," without detailing the mechanics of spitting or swabbing the mouth as appropriate to the collection device. These subsections on blood and oral fluid collection do not imply the possible use of interim containers. Finally, subsection (G) provides that all specimens will be refrigerated when not in transit or under examination. Therefore, it is more appropriate to interpret the regulation where 'collection' is simply a general term applicable to the entire process of taking of blood, urine, and oral fluid for testing—but where blood is 'drawn' from the subject to the vacuum container, urine on the other hand is 'deposited' from the subject to the screw top container. The purpose of the regulation is to preserve the quality of the specimen to ensure accurate test results, therefore the regulation dictates urine is to be deposited into a *clean* plastic or glass screw top container. The regulation should not be read to specifically permit the use of other containers.

**{¶ 18}** Nevertheless, circumstances may arise where, although less than ideal, urine might initially contact some other apparatus or collection device after exiting the body and before entering the screw top container. For example, a urine specimen might

be collected using a catheter, or a hospital's portable urine receptacle. *See State v. Abner*, 2021-Ohio-4549, ¶ 18 (12th Dist.); *see also State v. Eaton,* C.P. No. CR 2014-01-0077, 2014 Ohio Misc. LEXIS 35516, at *21 (July 3, 2014). In these situations, the State may still be able to substantially comply with the regulation if that apparatus or device is *clean* and does not contaminate the specimen.

{¶ 19} Here, we find the State substantially complied with the regulation because appellant's urine was collected in a clean, single-use, cardboard bedpan and transferred into the appropriate plastic container from the OVI test kit immediately after. Detective Forrer's uncontroverted testimony at the suppression hearing established he was able to see that the bedpan was unused prior to collecting appellant's urine specimen, and that it would have been apparent if the bedpan was wet or otherwise degraded. After the State demonstrated substantial compliance with the regulation, the burden shifted to appellant to demonstrate that she was prejudiced by the use of the cardboard bedpan as "less than strict compliance." *See Ossege* at ¶ 21. There is no indication from the suppression hearing that the cardboard bedpan was contaminated and appellant only speculates that it might have been. Appellant is unable to demonstrate actual prejudice, therefore substantial compliance with the urine collection regulation is sufficient.

{¶ 20} Appellant's first assignment of error is overruled.

{¶ 21} Assignment of Error No. 2:

> THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING THE MOTION TO SUPPRESS AS THE SAME RELATES TO THE ADMISSIBILITY OF STATEMENTS MADE BY DEFENDANT-APPELLANT DURING AN INTERVIEW CONDUCTED AT THE HOSPITAL.

{¶ 22} In her second assignment of error, appellant argues that the interview conducted by Detective Forrer on her at the hospital constituted a custodial interrogation

and therefore she was entitled to *Miranda* warnings prior to being questioned.

**{¶ 23}** "It is well-established that before law enforcement officials question a suspect in custody, the suspect must be advised of his *Miranda* rights and make a knowing and intelligent waiver of those rights before any statements obtained during the interrogation will be admissible as evidence." *State v. Hernandez-Martinez*, 2012-Ohio-3754, ¶ 8 (12th Dist.). However, the duty to advise a suspect of constitutional rights pursuant to *Miranda* is only required when the police subject a person to custodial interrogation. *State v. Byrne*, 2008-Ohio-4311, ¶ 10 (12th Dist.).

**{¶ 24}** "*Miranda* defines custodial interrogation as any 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *State v. Vansickle*, 2014-Ohio-1324, ¶ 54 (12th Dist.), quoting *State v. Matthews*, 2013-Ohio-3482, ¶ 10 (12th Dist.). In determining whether an individual was in custody during an interrogation, the court must examine the totality of the circumstances surrounding the interrogation. *State v. Robinson*, 2015-Ohio-4533, ¶ 12 (12th Dist.). A person is in custody if he is formally placed under arrest prior to a police interrogation, or, if not formally arrested, when there is a significant restraint on his freedom of movement. *Id.* This determination "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *State v. Henry*, 2009-Ohio-434, ¶ 13 (12th Dist.). Therefore, "[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *Robinson* at ¶ 12, quoting *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995).

**{¶ 25}** In the present case, appellant was not being held for a custodial interrogation when Detective Forrer briefly interviewed her at the hospital. While there are

some instances in which the questioning of a defendant at a hospital may amount to a custodial interrogation, that is simply not the case here. *See State v. Fridley*, 2017-Ohio-4368, ¶ 37 (12th Dist.) (finding defendant was not subjected to custodial interrogation in the hospital where he was only restrained by an IV connection in his arm and he was not otherwise coerced by hospital staff or police into answering questions). Although appellant was lying in bed in her hospital room when Detective Forrer came to interview her, she was able to walk and was not restrained. The interview lasted a short time, just over three minutes, and the door to appellant's room was kept open for the duration, and was only later closed to give appellant some privacy when providing the urine sample. Appellant was not in custody, therefore Detective Forrer was not required to provide *Miranda* warnings prior to interviewing appellant.

{¶ 26} Appellant's second assignment of error is overruled.

### III. Conclusion

{¶ 27} We find that the trial court did not err in denying appellant's motion to suppress.

{¶ 28} Judgment affirmed.

M. POWELL and BYRNE, JJ. concur.

## JUDGMENT ENTRY

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, and the same hereby is, affirmed.

It is further ordered that a mandate be sent to the Preble County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed in compliance with App.R. 24.

/s/Robert A. Hendrickson, Presiding Judge

/s/ Mike Powell, Judge

/s/ Matthew R. Byrne, Judge